**SILLS CUMMIS & GROSS P.C.**
Andrew H. Sherman, Esq.
S. Jason Teele, Esq.
Gregory A. Kopacz, Esq.
Oleh Matviyishyn, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 (Telephone)
(973) 643-6500 (Facsimile)
asherman@sillscummis.com
steele@sillscummis.com
gkopacz@sillscummis.com
omatviyishyn@sillscummis.com

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| GLOBAL BENEFITS GROUP, INC., *et al.*[1] | Case No. 24-16134 (CMG) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY PLEADINGS**

Howard Ehrlich, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Director of Debtor GBG Holding Incorporated ("**Holding**"), General Counsel for Global Benefits Group, Inc. ("**GBG**") and an authorized representative of International Claims Services, Inc. ("**ICS**" and, together with Holding and GBG, the "**Debtors**"). I have over thirty years of experience in the insurance industry, holding or having held management positions in legal, claims and operations roles. I am licensed to practice law in the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Global Benefits Group, Inc. (2750) GBG Holding Incorporated (0280); and International Claims Services, Inc. (6650). The Debtors' address is 902 Carnegie Center Drive, Suite 100, Princeton, NJ 08540.

States of New Jersey, New York, and Pennsylvania. I received my Bachelor of Science degree from Cornell University and both a Master of Business Administration and Juris Doctorate degrees from Seton Hall University.

2. I submit this declaration (the "**First Day Declaration**") in support of the First Day Motions (defined below). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by the Debtors or their professionals, were learned from my review of relevant documents, or are my opinion based upon my experience in the insurance industry and knowledge of the Debtors' operations and financial condition. I am over the age of eighteen (18) and authorized to submit this First Day Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

3. On the date hereof (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11, subchapter V, of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

4. The Debtors are currently operating their businesses and managing their properties as debtors-in-possession pursuant to section 1184 of the Bankruptcy Code.

5. On the date hereof or shortly thereafter, the Debtors intend to file several motions and applications (collectively, the "**First Day Motions**") to allow the Debtors to continue operating while under the protection of this Court with minimum disruption to their business or loss of value to their assets. I am familiar with the contents of the First Day Motions, and believe the relief sought in each such motion is necessary to maximize the value of the Debtors' estates.

6. This First Day Declaration is presented in four parts: **Part I** describes the background and business of the Debtors; **Part II** describes the Debtors' prepetition capital structure and indebtedness; **Part III** describes the circumstances leading to the commencement of these chapter 11 cases; and **Part IV** sets forth the relevant facts in support of each of the First Day Motions.

## PART I:
## BACKGROUND AND BUSINESS OF THE DEBTORS

7. The Debtors' corporate structure is complicated, with many affiliated and subsidiary companies incorporated across the globe. GBG is a Delaware limited liability company, which wholly-owns Holding and ICS. In turn, GBG is wholly owned by non-Debtor GBG Insurance Limited ("**GIL**"), a Guernsey-based insurance company, which itself is wholly owned by GBGI Limited, another Guernsey-based company ("**GBGI**" and, together with the Debtors, GIL and other non-Debtor affiliates and subsidiaries, the "**GBG Group**"). A copy of the Debtors' corporate organizational structure is attached as **Exhibit A**.

8. The Debtors serviced health, life, disability, travel, and education insurance policies primarily to expatriates, international citizens and teachers and international students of American and international schools. The Debtors administered insurance for approximately 130,000 individuals, who are or were insured by either GIL or other insurers who reinsure a portion of GIL's risk.

9. As explained in Part III, in December 2023, GIL (who procured and wrote a majority of the insurance policies for clients), was voluntarily placed into administration in the Royal Court of Guernsey. The Debtors fulfilled administrative functions for GIL, and once GIL filed for administration, the Debtors lost most of their funding to continue operating along with most of their business. This loss of funding fast-tracked the Debtors into insolvency and into seeking relief from this Court.

10. The Debtors operate out of Princeton, New Jersey, as well as Miami, Florida and Foothill Ranch, California.

## PART II:
## THE DEBTORS' PREPETITION
## CAPITAL STRUCTURE AND INDEBTEDNESS

11. As of the Petition Date, the Debtors estimate that they have $5,119,497.69 in outstanding unsecured obligations, exclusive of contingent or unliquidated claims, to trade vendors, brokers, providers, and other creditors. The Debtors have no secured debt, except for

approximately four equipment financing/lease arrangements which may be asserted as secured claims.

12. A significant portion of the unsecured claims scheduled (or to be scheduled) by the Debtors relate not to obligations of the Debtors, but of GIL. As the Debtors were administrators for the GIL business, claims relating to insurance and claims covered by insurance policies are obligations of GIL and not the Debtors. In the course of the Debtors' business, those insurance related claims were paid with funds provided by GIL and were not satisfied with the assets of the Debtors. Accordingly, and to provide notice to all affected parties, such insurance related debts (which include claims of providers of medical services across the world) will be reflected in the Debtor's schedules of assets and liabilities as "contingent," "unliquidated," and/or "disputed."

## PART III:
## CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

13. The Debtors' path into bankruptcy started with an ownership change of GBGI, in February 2019, when GBGI transitioned from public ownership to being wholly privately owned by Elm Bidco LP ("**Elm Bidco**"). Elm Bidco is controlled by affiliates of Further Global Capital Management, a New York-based private equity company. No debt was incurred in the acquisition of GBGI.

14. Historically, GIL had no employees of its own. Rather, it operated as part of an integrated group (of which the Debtors were a part) of entities internationally but was reliant on the Debtors and other members of the GBG Group to carry out its operational functions.

15. Elm Bidco replaced GIL's management team after the acquisition and made other changes to the management of GIL and the entire group of companies. For example, the Chief Executive Officer and Chief Financial Officer were replaced, and the position of Chief Operating Officer was elevated. The Company also installed a Chief Risk Officer, Chief Actuary and Chief Human Resources Officer, in addition to other roles. I was appointed General Counsel, a role

that had not existed previously. Throughout the 2019-2021 period, the management team worked on numerous initiatives to dramatically improve the operations of the business.

16. While progress was steady, this process and operating results were significantly negatively impacted by the COVID-19 pandemic, given GIL's focus on health insurance for globally mobile populations. GIL suffered additional losses during this period which required Elm Bidco to invest as additional $7.5 million in December 2021.

17. By mid-2021, Elm Bidco decided that adequate progress was not being made, and a new Chief Financial Officer was hired. This appointment was followed by the hiring of a new Chief Executive Officer in August 2022, who had considerable experience in the international private medical insurance space.

18. The new Chief Financial Officer implemented a strategy to review the finance function and identify and mitigate any internal control deficiencies within the organization and established projects to improve GIL's reporting and balance sheet.

19. Based on both its audit and information provided by the finance department regarding its initial assessment, and despite earlier clean audits, BDO USA, GIL's auditor, identified certain deficiencies regarding historical internal controls at GIL. Immediate steps were taken by GIL to address these deficiencies. To the extent any claims may arise from or relate to such deficiencies, they are the property of GIL, not the Debtors.

20. A complete review of GIL's balance sheet resulted in a restatement of liabilities relating to periods prior to the Elm Bidco acquisition. Of the findings reached as a result of reviewing GIL's balance sheet, the most striking was the identification of a negative adjustment in capital of approximately $74 million. After this discovery was made, GIL's board of directors decided to pursue a recapitalization transaction or a sale of GIL to a counterparty with significant financial resources.

21. Ultimately, however, neither a recapitalization transaction nor a sale of GIL came to fruition. Thus, on December 13, 2023, the Board met and immediately resolved to take all steps to protect the interests of creditors, including commencing an administration proceeding in

Guernsey.

22. Given that GIL supplied the Debtors with the resources necessary to operate and perform the administrative functions of the GBG Group, GIL's financial struggles and its commencement of administration proceedings caused the Debtors to experience financial distress as well.

23. As a result, the Debtors took the necessary steps of commencing these cases to preserve and maximize the value of their assets. The Debtors intend to file a chapter 11 plan as expeditiously as possible to wind down their business and distribute the proceeds from the liquidation of their limited remaining assets to creditors.

## PART IV:
## FIRST DAY MOTIONS

24. The First Day Motions seek various forms of relief designed to maximize the value of the Debtors' estates for the benefit of creditors. I have reviewed each of the First Day Motions and believe that the Debtors have satisfied the applicable standards for the relief requested and that the Court's grant of the requested relief is in the best interests of the Debtors, their estates, as well as that of their creditors and other parties in interest. Each of the First Day Motions is summarized below. Capitalized terms used in this section have the meanings ascribed to such terms in the applicable motion.

25. **Joint Administration Motion**. The Debtors seek entry of an order directing the joint administration and procedural consolidation of the Debtors' related chapter 11 cases (the "**Joint Administration Motion**"). Specifically, the Debtors request that the Court maintain one file and docket for the Debtors' jointly administered cases under the case of Global Benefits Group, Inc. and that the cases be administered under a consolidated caption. Further, the Debtors request that an entry be made on the docket of Global Benefits Group, Inc. case to reflect the joint administration of these chapter 11 cases.

26. Many of the motions, hearings, and orders in these chapter 11 cases will affect all of the Debtors. The entry of an order directing joint administration of these chapter 11 cases will

reduce fees and costs by avoiding duplicative filings and objections. Further, joint administration will allow the Office of the United States Trustee for the District of New Jersey and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Parties in interest will not be harmed by the relief requested, but instead, will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

27. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue operating in the ordinary course without disruptions. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Joint Administration Motion.

28. **Cash Management Motion**. The Debtors seek entry of an order authorizing the Debtors to (i) continue and maintain their existing cash management system and bank accounts, and (b) continue using their existing business forms, checks and records.

29. As of the Petition Date, the Debtors maintain twenty-nine (29) accounts with two (2) banks as set forth in the Cash Management Motion. The Bank Accounts are maintained with financially stable banking institutions and insured by the Federal Deposit Insurance Corporation.

30. In the ordinary course of business, the Debtors maintain a cash management system to receive and disburse funds. Of the combined twenty-nine (29) accounts, three (3) are operating accounts (BoA account ending in x0525, BoA account ending in x3053 and U.S. Bank account ending in x8750), used to pay ordinary operating expenses. Two (2) accounts are premium accounts (BoA account ending in x0521 and U.S. Bank account ending in x8818). Payments made with respect to administration costs are paid from the U.S. Bank account ending in x8750. There are nine (9) claims accounts where funds are received from and paid to various third parties in the normal course of business. Prior to each bi-weekly payroll, funds are transferred to a payroll account at BoA account ending in x0529 to satisfy the Debtors' payroll obligations. Three (3) accounts are restricted and not available to fund operations, payroll or pay claims, including a BoA account ending in x2918, which is cash collateral for a letter of credit.

There are eleven (11) accounts with a zero ($0) balance and currently not in use. All transfers in, out and between the Bank Accounts are recorded and traceable.

31. The Cash Management System was designed to meet the Debtors' operating needs by enabling the Debtors to centrally control and monitor their funds, ensure cash availability and liquidity, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances and presentment information. The procedures employed in the use of the Cash Management System constitute the Debtors' ordinary, usual and essential business practices, and are similar to those used by other similar corporate enterprises.

32. I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

33. **Schedules Extension Motion**. The Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by sixteen (16) days, for a total of thirty (30) days after the Petition Date, without prejudice to the Debtors' right to request additional extensions.

34. Even in the best of circumstances, preparing a debtors' schedules of assets and liabilities and statements of financial affairs is a significant undertaking, requiring the Debtors to compile information from books, records, and documents relating to a voluminous number of claims, assets, and contracts. Here, the compilation of the information is significantly more complicated and labor-intensive due to Debtors' complex, global operations and the sheer volume of information involved (*e.g.*, the Debtors administered insurance for approximately 130,000 individuals and have over 2,000 broker, provider, vendor, service, real estate and other

contracts and leases). Simply put, collecting all necessary information requires a massive expenditure of time and effort on the part of the Debtors, who have few remaining employees.

35. The process of compiling the information necessary to complete the Statement and Schedules and review extant contracts and leases began well before the Petition Date but will not be completed within the time proscribed by the Bankruptcy Code, unless the deadline is extended as requested.

36. However, and in effort to provide prompt notice to the Court and all affected parties, the Debtors will provide a list of all parties to which they believe that they owe money to in connection with the bankruptcy filing. Over the next few weeks, the Debtors will work to provide complete lists of all parties which may have claims or be counterparties to contracts. The data collection in connection with that effort is significant and the Debtors will work with their limited staff as expeditiously as possible to complete that information so that amended schedules of creditors can be filed along with a statement of financial affairs.

37. I believe that the relief requested in the Schedules Extension Motion is appropriate because it (a) will not prejudice or adversely affect the rights of any creditor or other party in interest, and (b) will relieve the Debtors of a significant administrative burden. The Debtors' focus should be on transitioning into chapter 11 and maximizing the value of their estates for the benefit of their various stakeholders.

38. **Wage and Benefits Motion**. The Debtors seek authorization to (i) pay all pre-petition employee claims for wages, salaries and other accrued compensation; (ii) make all payments for which employee payroll deductions were withheld prepetition; (iii) reimburse all prepetition employee business and other expenses; (iv) make prepetition contributions and pay benefits under certain employee benefit plans; (v) honor worker compensation programs; (vi) pay other miscellaneous employee-related costs including processing costs and fees; and (vii) continue certain health, welfare and benefit programs.

39. As of the Petition Date, the Debtors believe they are current with respect to their employee wages. However, out of an abundance of caution, they request authority to pay such

wages, along with any other prepetition Employee Obligations, in an amount not to exceed the statutory cap of $15,150 per employee.

40. I believe the relief requested in the Wage and Benefits Motion is warranted, necessary and appropriate. In short, any delay in honoring the Employee Obligations could severely disrupt the Debtors' relationships with their employees and irreparably impair the employees' morale at the very time that their dedication, confidence and cooperation are most critical. The Debtors face the risk that their operations may be severely impaired if the relief requested in this Motion is not granted. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Obligations in the ordinary course of business during the pendency of these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should grant the Wage and Benefits Motion.

41. A copy of the Debtors' initial 13-week budget (the "**Budget**") is attached as **Exhibit B**. As demonstrated by the Budget, I believe the Debtors will have sufficient liquidity to satisfy all ordinary course operating expenses and bankruptcy administrative expenses that will come due after the Petition Date.

42. Finally, in accordance with section 1116(1)(B) of the Bankruptcy Code, I hereby certify that no balance sheet, statement of operations, or cash flow statement has been prepared that can be appended to the Debtors' chapter 11 petitions. The financial statements of GBG, inclusive of a balance sheet as of May 31, 2024 and an income statement for the period beginning January 1, 2024 through May 31, 2024, are unaudited and presented on a non-consolidated basis. In October 2023, the controller of the consolidated GBG Group left his position. For several months, the books and records of the GBG Group, including GBG, were not adequately maintained. Between November 2023 and as of the date of this filing, the following events were not properly recorded: (i) the year end close of financial statements as of and at December 31, 2023; (ii) sale transactions for the sale of non-Debtor assets to approximately record the resulting gain or loss on sales; (iii) cash receipts and cash

disbursements from January 1, 2024 to May 31, 2024 (iv) bank statement reconciliation as of May 31, 2024 for all twenty-nine (29) bank accounts held at Bank of America, N.A., and U.S. Bank National Association; (v) journal entries to record intercompany activity or write-off intercompany activity; and (vi) other general or adjusting journal entries, appropriate to reconcile and close the books and records of the unconsolidated financial activity of GBG. The Debtors are working with their advisors to prepare a balance sheet, statement of operations, and cash flow statement, which will be filed with the Court at a later date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 18, 2024                             */s/ Howard  Ehrlich, Esq.*
                                                 Howard Ehrlich, Esq.
                                                 General Counsel

## EXHIBIT A

12411187



## **EXHIBIT B**

12411187

**Global Benefits Group**
**Thirteen Week Cash Flow**
**June 2024**

**DRAFT - CONFIDENTIAL**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | TWCF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6/22/2024 | 6/29/2024 | 7/6/2024 | 7/13/2024 | 7/20/2024 | 7/27/2024 | 8/3/2024 | 8/10/2024 | 8/17/2024 | 8/24/2024 | 8/31/2024 | 9/7/2024 | 9/14/2024 | Total |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Retained TSS premium | - | - | - | - | - | - | - | - | 200,000 | - | - | - | - | 200,000 |
| MGEN Fees | - | - | - | - | - | - | - | 100,000 | - | - | - | - | 100,000 | 200,000 |
| Sale of Websites | - | - | - | - | - | - | - | - | 106,250 | - | - | - | - | 106,250 |
| Transfers from Mexican Subsidiaries | 800,000 | - | - | - | - | - | - | - | - | - | - | - | - | 800,000 |
| GIL Funding for Select Payroll | 57,749 | - | - | - | - | - | - | - | - | - | - | - | - | 57,749 |
| **Cash Receipts** | **857,749** | **-** | **-** | **-** | **-** | **-** | **-** | **100,000** | **306,250** | **-** | **-** | **-** | **100,000** | **1,363,999** |
| | | | | | | | | | | | | | | |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll | - | (106,536) | - | (27,173) | - | - | (27,173) | | | | | | | (160,882) |
| Contractors | (1,660) | - | - | - | - | - | (42,055) | | | | (34,317) | | | (78,032) |
| Data storage costs | - | - | - | - | (70,000) | - | - | | | | | | | (70,000) |
| Fees to TSS | - | (200,000) | - | - | - | - | - | | | | | | | (200,000) |
| PWC Tax Fees 2024 | - | - | - | - | - | - | - | | | | | | | - |
| Insurance | (23,000) | - | - | - | - | - | - | | | | | | | (23,000) |
| AMEX/BOA Credit Cards Employee T&E - when to c | - | - | - | - | - | - | - | | | | | | | - |
| **Cash Disbursements** | **(24,660)** | **(306,536)** | **-** | **(27,173)** | **(70,000)** | **-** | **(69,228)** | **-** | **-** | **-** | **(34,317)** | **-** | **-** | **(531,914)** |
| | | | | | | | | | | | | | | |
| **Net Operating Cash Flow** | **833,089** | **(306,536)** | **-** | **(27,173)** | **(70,000)** | **-** | **(69,228)** | **100,000** | **306,250** | **-** | **(34,317)** | **-** | **100,000** | **832,085** |
| | | | | | | | | | | | | | | |
| **Non-Operating Expenses** | | | | | | | | | | | | | | |
| Attorney | - | - | - | - | - | - | (100,000) | - | - | - | - | (80,000) | - | (180,000) |
| Financial Advisor | - | - | - | - | - | - | (78,000) | - | - | - | - | (49,040) | - | (127,040) |
| Noticing Agent | - | - | - | - | - | - | - | - | - | (35,000) | - | - | - | (35,000) |
| Sub V Trustee | - | - | - | - | - | - | (15,000) | - | - | - | - | (15,000) | - | (30,000) |
| Other Professionals | - | - | (20,000) | - | - | - | (20,000) | - | - | - | (20,000) | - | - | (60,000) |
| 401k audit 2023 and 2024 prepay | - | - | - | - | (20,000) | (20,000) | - | | | | | | | (40,000) |
| Professional Fee Contingency | - | - | - | - | - | - | (17,800) | - | - | - | - | (12,904) | - | (30,704) |
| **Non-Operating Expenses** | **-** | **-** | **(20,000)** | **-** | **(20,000)** | **(20,000)** | **(230,800)** | **-** | **-** | **(35,000)** | **(20,000)** | **(156,944)** | **-** | **(502,744)** |
| | | | | | | | | | | | | | | |
| **Net Cash flow** | **833,089** | **(306,536)** | **(20,000)** | **(27,173)** | **(90,000)** | **(20,000)** | **(300,028)** | **100,000** | **306,250** | **(35,000)** | **(54,317)** | **(156,944)** | **100,000** | **329,341** |
| | | | | | | | | | | | | | | |
| **Beginning Cash** | 1,927,677 | 2,760,766 | 2,454,230 | 2,434,230 | 2,407,057 | 2,317,057 | 2,297,057 | 1,997,029 | 2,097,029 | 2,403,279 | 2,368,279 | 2,313,962 | 2,157,018 | 1,927,677 |
| Reserve Cash | | | | | | | | | | | | | | - |
| Net Cash flow | 833,089 | (306,536) | (20,000) | (27,173) | (90,000) | (20,000) | (300,028) | 100,000 | 306,250 | (35,000) | (54,317) | (156,944) | 100,000 | 329,341 |
| **Ending Cash** | **2,760,766** | **2,454,230** | **2,434,230** | **2,407,057** | **2,317,057** | **2,297,057** | **1,997,029** | **2,097,029** | **2,403,279** | **2,368,279** | **2,313,962** | **2,157,018** | **2,257,018** | **2,257,018** |